IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 14, 2012

## STATE OF TENNESSEE v. CURTIS DEWAYNE STAGGS

**Direct Appeal from the Circuit Court for Lawrence County**
**No. 29161     Stella Hargrove, Judge**

---

**No. M2011-02361-CCA-R3-CD - Filed November 13, 2012**

---

A Lawrence County jury convicted the Defendant, Curtis Dewayne Staggs, of first degree premeditated murder, first degree felony murder, and aggravated robbery. The trial court merged the first degree murder convictions and imposed a life sentence, and imposed a consecutive twelve-year sentence for the aggravated robbery conviction. On appeal, the Defendant argues that: (1) the evidence is insufficient to support his convictions; (2) the trial court erred when it denied his motion for a new trial based upon a State witness recanting his testimony; (3) the trial court erred when it issued a material witness attachment; (4) the trial court erred when it imposed consecutive sentences; and (5) the trial court erred when it did not grant his motion for a new trial based upon the prior knowledge of the case by a juror. After thoroughly reviewing the record and applicable authorities, we find that the evidence is sufficient to sustain the Defendant's convictions and that the trial court committed no error. Accordingly, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

M. Wallace Coleman, Jr., Lawrenceburg, Tennessee, for the appellant, Curtis Dewayne Staggs.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Christie L. Thompson, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

# I. Facts
## A. Jury Trial

This case arises from the Defendant's participation in a robbery and shooting of the victim, Joann Rigling,[1] who died from the injuries she sustained. The victim was found on June 19, 1992, with one gunshot above her eye behind the counter of Phillip's One-Stop market in Saint Joseph, Tennessee, and the market cash register was missing. Jimmy Dale Hogan and Tammy Smith were arrested for the murder and robbery. Hogan was convicted after a jury trial but obtained post-conviction relief on appeal, and this Court ordered a new trial. During the reinvestigation of these crimes in preparation for Hogan's retrial, authorities learned additional information that led a Lawrence County grand jury to indict the Defendant for first degree premeditated murder, first degree felony murder, and aggravated robbery for his role in the 1992 murder and robbery.

At the Defendant's trial on these charges, the parties presented the following evidence: Josh Melton, a Tennessee Bureau of Investigation ("TBI") special agent, testified that he was assigned to work with the District Attorney General's office on a retrial for Jimmy Dale Hogan in connection with the victim's 1992 murder. At the initial meeting with the members of the District Attorney's office, Agent Melton said that "it was also brought to my attention . . . that [the] T.B.I. had suspected that other persons were involved in - - in the death of [the victim], and that if leads were developed about these other persons[,] to pursue those avenues."

Agent Melton testified that he began the investigation by conducting interviews. He indicated that one of the first "significant" interviews was with Penny Boyd. A "source" told Agent Melton that Boyd had heard the Defendant reference his involvement in the victim's death. After interviewing Boyd, Agent Melton attempted to corroborate her statement by arranging a "controlled telephone" call between Boyd and the Defendant.

During the controlled call, which the State played for the jury, Boyd warned the Defendant that Hogan was to be retried and that the State was also pursuing Phillip Rigling as a suspect. She stated multiple times during the call that she was concerned about the Defendant because of his admission to her while they were riding down the railroad tracks. The Defendant told Boyd not to worry and stated, "Hell they got who done it, that's all I know (laughter) that's all I'm sayin to em."

---

[1] In the record the victim's first name is spelled both "Joann" and "Joanne." For the sake of clarity, we spell the victim's first name as it appears in the indictment.

After the grand jury indicted the Defendant, Agent Melton traveled to Missouri to arrest the Defendant, and the Defendant agreed to speak with Agent Melton about the victim's murder. The Defendant told Agent Melton that, at the time of the victim's murder, he worked for a construction company, M.R. Dillard Construction Company, in Loretto,[2] Tennessee. The Defendant said that the employees frequently left the work site for periods of time that were not reflected on their time sheets. Agent Melton said that he asked the Defendant if he had taken leave under those circumstances on the date of the victim's death. The Defendant responded, "I've never taken leave under those circumstances."

Agent Melton then asked the Defendant if he recalled a conversation with Boyd and her husband, Mark Boyd, in which he made the statement that he had killed the victim. The Defendant said that he remembered the occasion but did not remember making that statement. The Defendant also said he remembered the telephone conversation with Boyd but denied any reference to a previous statement to Penny and Mark Boyd regarding his involvement with the victim's death. Agent Melton testified that he then disclosed to the Defendant that the telephone conversation with Penny Boyd was a "controlled call" and that he had been listening to the conversation. Agent Melton told the Defendant that it was "obvious" to him that the Defendant remembered his statement to the Boyds during the controlled call and asked the Defendant why he could not now remember those statements. The Defendant responded that he wanted to be a "bad ass" and that he "bragged about a lot of things." He further explained that, when he was speaking with Boyd during the controlled call "and she made the comments about what [he] said . . . [he] figured, hell, yeah, I probably said it." The Defendant then reiterated that he did not have any involvement in the victim's death.

Agent Melton testified that the Defendant acknowledged having met Phillip Rigling, the victim's husband, and Hogan, but he said that he and Hogan "weren't close friends." The Defendant told Agent Melton that he had heard a rumor that Rigling had paid to have his wife killed. The Defendant recalled that he was working in a large ditch at the junction of Highway 43 and Smith Circle when the victim was killed. He remembered the event because he watched an ambulance drive by and then approximately thirty minutes later he saw the ambulance return down the road.

Agent Melton testified that, on April 5, 2010, he had the opportunity to interview Jimmy Dale Hogan at the state prison in Bledsoe County, Tennessee. Following the interview, Agent Melton reduced Hogan's statement to writing and included it in the TBI

---

[2] The trial transcript contains the reference to "Loretta, Tennessee." This Court takes judicial notice that the city at reference in this case in Lawrence County is "Loretto, Tennessee."

3

Investigative Report. During further investigation, Agent Melton said that he was able to corroborate Hogan's statement.

Rita Hughes testified that, on June 19, 1992, she was delivering glass from Loretto, Tennessee, to Alabama. At approximately 10:30 a.m., she was driving down Highway 43 on her return trip to Loretto. Hughes said that she normally stopped at Phillip's One-Stop market when she was making deliveries. As she neared the market and attempted to turn into the parking lot, she saw a car blocking the driveway, so she decided not to stop and continued on to Loretto. Hughes recalled that it struck her as "odd" that someone had parked their car in that manner. Hughes described the vehicle as "a big black car, older model." She said that she saw a passenger seated in the vehicle with dark hair and a "Fu Manchu type mustache." Hughes said that she recognized the man in the passenger seat as Hogan. Hughes said that a man was seated in the driver's seat of the vehicle as well, but she did not recognize him.

On cross-examination, Hughes testified that she "kn[e]w of" the Defendant at the time of these crimes but could not tell whether he was the man seated in the driver's seat.

Lorie Noblett testified that, on Friday, June 19, 1992, she, her mother, and her daughter were going to Florence to go shopping. On their way to Florence, they stopped at Phillip's One-Stop market at around 11:00 a.m. Noblett explained that, at the time, her daughter was eighteen-months old and "fussy," so she stopped to get her something to eat. Noblett recalled that her mother and her daughter remained in the car while Noblett went inside Phillip's One-Stop market. Upon entering, Noblett noticed that there was not an employee behind the counter. Noblett began calling out "Is anybody here?" and walked to the back of the store but did not find anyone. Noblett returned to the front of the store and noticed blood on the floor and glass. Noblett looked around behind the counter and saw the victim lying on her back on the floor with blood on her face. Fearing that there was an ongoing robbery, Noblett fled the store to her vehicle where she instructed her mother to drive to the next store so she could notify police that the victim had been shot. Noblett notified police and then returned to Phillip's One-Stop market where she waited for police officers to arrive.

Dennis Daniels testified that, at the time of this crime, he was the Saint Joseph Police Chief. Daniels said that, on June 19, 1992, at around 11:00 a.m., he received a call that Phillip's One-Stop market had been robbed and the victim killed. When he arrived at the crime scene, Noblett and several other people were standing outside. Daniels entered the market and saw a large pool of blood on the counter. Behind the counter he found the victim's body lying on the floor. Daniels observed bloody prints on the floor, appearing as though someone had stepped in the blood and then walked across the floor. Daniels recalled

the recovery of a spent .22-caliber casing lying on the floor. Daniels identified photographs from the crime scene, one of which was the outside of the market and depicted an ambulance parked in front of the market. Daniels testified that the ambulance in the photograph was the only ambulance at the scene that day and was at the scene for "probably an hour or so."

Daniels testified that he first checked to see if the victim was breathing and determined that she was not. Based on the areas of blood and the victim's position, Daniels estimated that the victim fell forward where blood pooled on the counter when she was shot. A person or persons then pulled her off the counter, and she fell backward striking her head on the concrete floor, causing her skull to "burst" and more blood to pool on the floor beneath her.

Daniels testified that the Highway Patrol, the Sheriff's Department, and the TBI assisted in the investigation. Daniels described the first few weeks after these crimes as the "intense stage" of the investigation. Every morning all officers involved in the investigation would meet and get assignments for the day. During this initial investigation, the Defendant called the Sheriff's Department on July 19, 1996, and provided a phone number and asked that Daniels call him. Daniels called the Defendant, and the Defendant told Daniels that he had information on the robbery and murder and asked Daniels to "come by" to talk about it. Daniels was acquainted with the Defendant and said that the phone number he had called was that of the Defendant's parent's residence. Daniels said that the Defendant's parent's home was "less than a quarter of a mile" from Smith Circle and Highway 43, where the Defendant said he was working in a ditch at the time of the murder.

Daniels testified that he met with the Defendant at the Defendant's parent's residence at approximately 8:30 p.m. Daniels said that, during this meeting, the Defendant mostly asked questions rather than providing information. The Defendant told Daniels that he had seen on the news that Hogan and Smith had been arrested. He then told Daniels that Daniels had "two of the three" but that he still had "one more to go." The Defendant would not disclose how he knew there was another person involved in the robbery and murder, "he just advised he knew." He also told Daniels that Smith had taken a handgun that belonged to someone else to commit the crimes.

On cross-examination, Daniels agreed that in his police report of the interview with the Defendant it read, "[The Defendant] advised [Daniels] that Tammy Smith was drunk, passed out in the vehicle. That Jimmy Dale Hogan and Danny Martin had entered the store." Daniels further agreed that the Defendant told him that Hogan shot the victim, and Martin had taken the cash register. Daniels said the Defendant told him that Hogan and Martin "were too dumb to get [the cash register] opened."

5

Dr. Amy R. McMaster, a forensic pathologist, testified as an expert witness in the field of forensic pathology. Dr. McMaster reviewed the autopsy report for the victim, which was performed on June 19, 1992. Based upon her review, Dr. McMaster testified that the victim died from a gunshot wound to her head that injured the brain and skull.

Tina Ridgeway, the victim's daughter, testified that she worked for her step-father, Phillip Rigling at the Phillip's One-Stop market, coordinating the purchasing, working the register, bookkeeping, and making bank deposits. Ridgeway recalled that before her mother's death, Rigling approached her and asked her to put $15,000 in cash in her personal safe deposit box. Ridgeway agreed and, shortly after her mother's death, Rigling asked Ridgeway for the $15,000, so she withdrew the money from her safe deposit box on July 13, 1992, and gave it to Rigling.

Ridgeway testified that her mother was a hard worker and was working two jobs at the time of her death. Through one of her jobs, she had a $60,000 life insurance policy. Ridgeway explained that, because her mother never designated a beneficiary on the document, the life insurance money went to Rigling at her mother's death.

On cross-examination, Ridgeway testified that Rigling paid her mother's funeral expenses, but she did not know when he paid those expenses.

Hogan testified that he had been incarcerated for sixteen years, serving sentences for his felony murder and especially aggravated armed robbery convictions. Hogan testified that these convictions stemmed from the robbery of Phillip's One-Stop market and the murder of the victim. Hogan said that his conviction for felony murder had been remanded for a retrial. Hogan filed a post-conviction petition alleging a complaint against his attorney. A hearing on the petition was held in April 2005 and Hogan, for the first time, testified regarding this case. At this hearing, Hogan said several times "I wasn't there. I didn't do it."

Hogan testified that he was not telling the truth when he made these statements at the post-conviction hearing. He explained that, after his felony murder conviction was remanded for retrial, his attorney showed him the Defendant's statement implicating Hogan as the shooter, and it angered him. Hogan said that, "When I was offered a plea agreement to set the record straight, I took it." He reiterated that he was testifying because he wanted to "set the record straight."

Hogan then relayed the events leading up to the robbery and the victim's murder. Hogan said that, about a week before the robbery, he was mowing the yard when the Defendant stopped by and asked Hogan if he wanted to make some "easy money." Hogan

agreed, and the Defendant said he needed to work out a few details but for Hogan to meet him at his mother's house that evening. When Hogan arrived at the Defendant's mother's house, the Defendant told him that he knew a man who owned a store and wanted the Defendant to rob the store. Hogan then drove the Defendant to Phillip's One-Stop market. Before the men got out of the car, the Defendant instructed Hogan to be quiet and let the Defendant "do all the talking." The men entered the store, and the Defendant introduced Hogan to Phillip Rigling, who was standing behind the counter. Rigling told the men that he wanted them to stage a robbery. As Rigling and the Defendant talked, Hogan began to get "funny vibes" like he was a "third-wheel or something," so he moved back toward the front door. While standing by the front door, he overheard Rigling say to the Defendant, "The bitch ain't getting what I worked my ass off for." After a few more minutes, the Defendant and Hogan left. Hogan said that, during the conversation with Rigling, he began to suspect that "there was more going on than a robbery."

Hogan testified that, after he and the Defendant got back inside the car, the Defendant pulled out a pistol and said, "I don't need to tell you to keep your mouth shut, right?" Hogan responded by saying, "Yeah, right." The Defendant then threatened to kill Hogan's mother if he said "anything." Hogan drove the Defendant back to his mother's house. The Defendant exited the vehicle and then told Hogan, "We're going to do this Friday."

Hogan testified that he did not speak with the Defendant in the days following the meeting with Rigling. He called the Defendant on Thursday night, and the Defendant told Hogan to meet him around 9:00 a.m. the next day because the Defendant needed to "go clock in" at work before he met with Hogan. Hogan testified that he drove a 1978 black Olds Cutlass Supreme to meet the Defendant at his mother's house on the morning of June 19, 1992. When the Defendant arrived, he told Hogan to follow him. Hogan followed the Defendant across the state line, where the Defendant stopped off of a little gravel road near a marshy area. The Defendant got out of his car and into the front passenger seat of Hogan's Cutlass Supreme. Hogan recalled that they drove around for awhile until he stopped to buy cigarettes from a store in Green Hill, Alabama. When Hogan came out of the store, the Defendant told Hogan, "It's time to go," and he drove back to Tennessee. When they arrived at Phillip's One-Stop market, there were cars in the parking lot, so the Defendant instructed Hogan to continue driving. The Defendant guided Hogan through a series of turns, which brought them to the back side of the market. The Defendant instructed Hogan to "pull in," and Hogan parked by the front door of the market. The two men walked inside the market, and the Defendant immediately demanded that the victim open the cash register. The victim refused, and the Defendant shot her.

Hogan described the inside of the store and identified pictures confirming that Phillip's One-Stop market was the location of the robbery and shooting. Hogan indicated on

a photograph where he parked and where they entered and exited the market. Hogan said that the victim was the only person in the market and was seated on a stool behind the counter when they entered. After the Defendant shot the victim, she fell face down on the counter. Hogan began shouting, "Let's go. Let's go, man." The Defendant told Hogan to open the cash register. As Hogan tried to open the cash register, the Defendant grabbed the victim and "slung her back." Hogan said that "the next thing I know there's blood everywhere. There was blood everywhere." The Defendant reached behind the counter and brought out a brown paper bag. The Defendant then said, "Let's go," and Hogan responded that he could not get the cash register open. The Defendant said, "Damn, you're stupid," pulled out a pair of pliers, and "started whacking on the cord of the register." After the Defendant cut the cord, Hogan picked up the cash register and the two men left. As they exited the market, the Defendant said that he would drive. Hogan got into the passenger seat and put the cash register down on the floorboard between his feet. The Defendant drove back to the location where he had left his car.

Hogan testified that he got out of his car and carried the cash register over to the Defendant, who put the cash register in the passenger side floorboard of the Defendant's vehicle. The Defendant then said to Hogan, "I ain't got to tell you to keep your mouth shut." Hogan told the Defendant he did not. The Defendant pulled a stack of money out of the paper bag he had taken from the market and handed Hogan a stack of money with a band around it that read $5,000. Hogan took the money, got back in his car, and drove away.

Hogan testified that, several days later, he asked the Defendant when he would get the "rest of the money." The Defendant told Hogan to meet him at the Defendants's mother's house on Sunday. On Sunday, the two men drank beers, smoked marijuana joints, and talked. At one point, the Defendant went inside to call Rigling. When he returned, he told Hogan that Rigling would be there in "an hour or so." The two men continued drinking and smoking marijuana joints until Rigling arrived in a truck. Rigling handed the Defendant a paper bag and said, "There's a little extra there for being cool." Rigling remained for a few minutes and then left. After Rigling left, the Defendant and Hogan divided the $7,500 that was in the paper bag. Hogan said that he did not see the Defendant again until this trial.

On cross-examination, Hogan testified that he was currently serving a twenty-year sentence for his especially aggravated robbery conviction. The State's offer, in exchange for his testimony in this trial, was for a twenty-year concurrent sentence for the felony murder charge. Hogan agreed that, in considering the time Hogan has already served, he was very near completion of these sentences. Hogan admitted that he had lied under oath before in relation to his post-conviction petition. Hogan agreed that he was arrested in 1996 and first identified the Defendant's involvement in these crimes in 2010.

The State then presented four witnesses, all employed by M.R. Dillard Construction Company in 1992, who testified similarly as to the worksite supervision. The witnesses testified that, due to relaxed supervision on the worksites, it was common for employees to leave for periods of time during the work day without their absence being reflected on a time sheet.

Oscar McDowell testified that he was an inmate at Limestone Correction Facility. McDowell said that in 1992 he worked for M.R. Dillard Construction Company. McDowell said that, at one point, he served as a "Lead Man" with employees working for him. He said that it was possible for employees to leave the work site for several hours and return without having it reflected in their pay. McDowell recalled the day the victim was killed. He said that his father came by the work site and told him the news. McDowell said that he remembered seeing the Defendant first thing in the morning at 6:30 a.m. but did not see him at any other time during that day.

McDowell testified that a group of people that had attended school together would sometimes go to a bar after work and shoot pool. On one such occasion, the Defendant made the statement that the authorities would never solve the crime because there were no witnesses, no gun, and no fingerprints. The Defendant stated that the cash register had been thrown in the creek. McDowell said that the Defendant never explained how he knew these statements to be true.

On another occasion, McDowell and some other men, including the Defendant, were working on a motorcycle. The Defendant made the same statements regarding the lack of evidence and that "there would never be anything done about that." McDowell testified that the Defendant drove different vehicles during the time period surrounding the victim's murder, one of which was a silver 1975 Toyota Corolla.

On cross-examination, McDowell testified that he was incarcerated for possession of a forged instrument and leaving his job while on county work release.

Jeff Longhorn testified that he worked at M.R. Dillard Construction Company in 1992, while the company was laying sewer pipes for the city of Loretto. Longhorn recalled the specific day the victim was killed because he was asked to flag traffic in the Smith Circle area. He remembered an ambulance and State Trooper drove by as he was serving as a flagman. Longhorn said that he knew the Defendant and did not see him working in the Smith Circle area that day. Longhorn testified that it was "commonplace" for employees to take periods of time off during the day without reflection in their pay or pay slips.

Steven Higgins testified that he and the Defendant had a conversation regarding the victim's murder while the two men were incarcerated in the Lawrence County jail. Higgins said that the Defendant told him that Hogan and "some other woman" were "riding around" and needed money. Someone brought up that Rigling wanted his wife murdered and "they" came up with a plan. Higgins said that the Defendant and Hogan were hired to make the shooting look like a robbery. Higgins said that the Defendant told him that the Defendant left work and that he and Hogan went to the market and killed the victim and then returned to work laying gravel down.

Higgins described some of the details of the robbery that the Defendant disclosed to him. Higgins said that the Defendant and Hogan entered the market, engaged in a confrontation with the victim, and then the Defendant shot her. The Defendant told Higgins that, because they could not open the cash register, they took the cash register with them when they left. The Defendant said that there was "a couple of hundred dollars" in the cash register and there "wasn't nothing to be found." The Defendant said he was paid a "large amount of money" in two separate payments to commit the crime. Higgins said the Defendant told him that he had an alibi. Higgins testified that he did not know Hogan and was unfamiliar with these crimes that the Defendant described to him in jail.

On cross-examination, Higgins said that he was twenty-years old. Higgins agreed that the Defendant was "much older." Higgins said that he did not know the Defendant before meeting him in jail after the Defendant's arrest in this case. Higgins agreed that he had pending criminal charges at the time of his testimony. Higgins said that the only news coverage he saw regarding this case was his attorney, who also represented Hogan, speaking on the news about Hogan's case.

Penny Boyd testified that she was related to the Defendant by marriage. Boyd said that, approximately a month after the death of the victim, she, the Defendant, and her husband, Curtis Boyd, were "riding down the railroad tracks" to test the new tires on their truck. Boyd recalled that the Defendant had been drinking, and she said that the Defendant "brag[ged] a lot" when he drank. During their drive, Boyd made the statement that it was "bad about [the victim] getting killed, and [Hogan] done it." Initially, the Defendant agreed, and then he said that he had killed the victim but that he did not want to talk about "it." He then said to Boyd, "You would do anything for $50,000." He again stated that he did not want to talk about "it," but he did say that he did not receive all the money. Boyd said that, upon hearing these statements, she was initially unsure what to think but later felt "shocked" by the Defendant's admission.

Boyd testified about her subsequent contact with Agent Melton from the TBI during the reinvestigation of the robbery and murder. She said that she met Agent Melton for an

10

interview and, after telling Agent Melton about her conversation with the Defendant shortly after the victim's murder, she agreed to participate in a controlled telephone call to the Defendant.

On cross-examination Boyd agreed that she, her husband, and the Defendant were all drinking when they were "riding down the railroad tracks." Boyd again said that the Defendant bragged when he drank and that he had made false statements to her before when drinking. Boyd said that she did not tell anyone about the Defendant's statements after he made them. She said that she did not think his statements were true while the two were talking, but she later thought about it and believed he did kill the victim.

Boyd testified that she failed to appear pursuant to a subpoena in this case and, as a result, she was arrested. Boyd explained that she did not appear in court as the subpoena required because she was sick and it did not occur to her to notify the court of her inability to be in court. Boyd said that her husband was also arrested for failure to appear in court because he took Boyd to the doctor rather than attend court.

Raymond DeBartolomies testified, on the Defendant's behalf, that he worked at M.R. Dillard Construction Company in 1992, laying sewer pipe in Loretto, Tennessee. DeBartolomies said that he was "working in the hole" along the highway on the day of the robbery and murder and recalled seeing an ambulance and multiple State Troopers driving past him. DeBartolomies said that the Defendant was working with him at the time. DeBartolomies said that, after the victim's murder, the Defendant continued to work at M.R. Dillard Construction Company and never made any changes that would have indicated that he had obtained a large sum of money.

On cross-examination, DeBartolomies agreed that he was convicted of felony crimes in Florida and New Jersey under the name "John Apfel." When confronted with payroll records indicating his first day of work at M.R. Dillard Construction Company was August 10, 1992, DeBartolomies said that he was unsure on what date he saw the ambulance and State Troopers.

Robert Perry testified that, in the summer of 1992, he worked for M.R. Dillard Construction Company on a sewer system for the city of Loretto. Perry said that he saw the Defendant on a daily basis in 1992 and that the Defendant did not own a vehicle in June 1992. Perry said that the Defendant either got a ride to work or walked. Perry said that, during that time period, the Defendant never showed any signs of having a large sum of money. Perry said that the Defendant "always" owed him money.

11

Roy Payne testified that he had known the Defendant his whole life. Payne said that he owned his own carpentry business. Payne said that the Defendant's full-time job was with M.R. Dillard Construction Company but that the Defendant would occasionally help Payne in his carpentry business on the weekends or after work. Payne said that, when the Defendant worked for him, Payne would have to give the Defendant a ride because the Defendant did not have a driver's license or car. Payne said that the Defendant's life style never changed and nothing indicated that he had received a large sum of money.

Judy Lumpkins testified that she owned "Judy's Deli" on Highway 43 during the summer of 1992. Lumpkins said that, because M.R. Dillard Construction Company was working on a sewer project in Loretto that summer, many of their employees frequented her deli. Lumpkins said that the Defendant was one of her "regular customers" that summer and that he did not have a car in June 1992. Lumpkins said she sold the Defendant her Toyota Corolla in 1994, after she had a car wreck and needed money to pay medical bills. Lumpkins denied ever selling the Toyota Corolla to Mc Dowell. Lumpkins testified that the Defendant would keep a tab at her deli and pay her when he received his paycheck on Friday.

Jeremy Gieske testified that he was incarcerated in the Lawrence County jail but was previously an inmate in the Tennessee Department of Correction. At some point between 2006 and 2008, Gieske met Hogan in state prison. Gieske said that Hogan spent a great deal of time working on a post-conviction or habeas corpus petition to overturn his murder charge. Gieske said that Hogan told him that he "had a good chance of getting it overturned, and if he had a scapegoat, he would get all the way out of it."

The State called Keith Smith, City Manger for Loretto, as a rebuttal witness. Smith testified that the payroll records for June 1992 listed the Defendant as an M.R. Dillard Construction Company employee but did not list a "Raymond Bartolomies" or "John Apfel" during that time period. Smith said that the name Raymond DeBartolomies first appears on the payroll records on August 10, 1992.

Following the close of proof and deliberations, the jury convicted the Defendant of first degree premeditated murder, first degree felony murder, and aggravated robbery. At a subsequent sentencing hearing, the trial court merged the felony murder conviction into the premeditated murder conviction and sentenced the Defendant to life imprisonment. The trial court imposed a consecutive twelve-year sentence for the aggravated robbery conviction for an effective sentence of life plus twelve years in the Tennessee Department of Correction.

**B. Motion for a New Trial**

12

Among other issues, the Defendant asserted that he was denied an impartial jury because juror William Sherrill failed to disclose his prior knowledge of the Defendant and that he should be awarded a new trial because the State's witness, Higgins, had recanted his trial testimony. At the motion for new trial hearing, the parties presented the following proof relevant to those two issues: Steven Mann testified that his father, William Sherrill, served as a juror for the Defendant's trial. Mann said that Sherrill knew the Defendant because Sherrill "always talked about [the Defendant]" saying that Sherrill, Mann's uncle, and the Defendant "hung out together at the trailer park." Sherrill also told Mann that the Defendant "could have been [his] daddy." Mann recalled another occasion when he mentioned to Sherrill that he had been in jail with the Defendant, Sherrill said, "well, if I had anything to do with that SOB, he'd fry on the stand." Mann said that Sherrill did not like the Defendant because the Defendant "could have been [Mann's] daddy."

On cross-examination, Mann said that he did not meet the Defendant until November 2010.

Carol Staggs testified that Sherrill was her son's father. Staggs said that Sherrill knew the Defendant because in 1983 or 1984, a group, which included the Defendant and Sherrill, "h[u]ngout in the same trailer park." Staggs said that Sherrill had "ill-will" toward the Defendant because he believed that either the Defendant or the Defendant's brother was Mann's father.

William Sherrill testified that during jury voir dire, when he was asked if he knew the Defendant, he answered that he did not. Sherrill said that his son's mother married "a Staggs" and lived with the Defendant's brother a long time ago but that he did not know the Defendant. Sherrill testified that he answered the questions posed to him during voir dire truthfully and denied harboring any prejudice or bias against the Defendant.

On cross-examination, Sherrill testified that he last saw his son, Mann, two years ago. Sherrill denied telling Mann that he would like to see the Defendant "fry." He further denied ever stating that the Defendant might be Mann's father.

Steven Higgins testified that he lied when he testified at the Defendant's trial. Higgins explained that he lied because he felt he was "being forced into saying something that [he] thought was going to benefit [him] in the end." At trial, Higgins testified that the Defendant admitted his role in the robbery of Phillip's One-Stop market and the murder of the victim. At the hearing, Higgins said that the only statement the Defendant made to him in reference to those crimes was that the Defendant did not do it. Higgins said that his attorney, Stanley Pierchoski, who also represented Hogan, pressured him into giving the statement against the Defendant. In explaining how he learned of all the specific details of

13

the crime that he testified to at trial, Higgins said that Pierchoski "made [him] aware of the events that happened and put it in my head." Higgins said that Pierchoski and Agent Melton "kind of led [him] in a certain direction" and that he also read "letters and stuff" that had been printed off the internet. Higgins said that he told Agent Melton that he did not want to testify consistently with his statement, but he was told "it was too late."

On cross-examination, Higgins said that his testimony at trial came from his attorney and that he "was being guided by the District Attorney's Office and the TBI agent."

Agent Melton testified that he interviewed Higgins during his investigation. He recalled that Stanley Pierchoski contacted him through the District Attorney's office and said that his client had some information regarding the investigation of the Defendant. Agent Melton met with Higgins and Pierchoski and "listened." Agent Melton said that he asked Higgins to tell him what he knew and then Higgins provided very detailed information that was corroborative of other evidence in the case. Agent Melton testified that it is standard procedure that, when speaking with a witness who had criminal charges, he does not talk about those charges or any potential plea agreement.

Stanley Pierchoski testified that, while representing Higgins on unrelated charges, Higgins asked him to arrange a meeting with a TBI agent to discuss what he knew about the Defendant's case. Pierchoski said that he did not discuss with Higgins what he wanted to tell the TBI agent but limited his role to arranging the meeting for Higgins with Agent Melton. At the meeting, Higgins gave a "rather lengthy statement" concerning what he had heard from another inmate, the Defendant. Pierchoski said that Higgins did "all the talking" while Agent Melton took notes. Pierchoski said that he was appointed to represent Hogan in the retrial of his felony murder charge but that he never discussed the merits of the case with Higgins.

After hearing this evidence, the trial court denied the Defendant's motion for a new trial. In doing so, the trial court made the following statement:

> I do want to say for the record, . . . in observing the demeanor of the various witnesses before the Court today, the Court finds Steven Higgins 100 percent not credible. The only other witness that is credible is Mr. Sherrill. The Court questions considerably the credibility of Steven Mann and Carol Staggs in this record. Of course, Josh Melton's testimony is credible.

It is from these judgments that the Defendant now appeals.

14

## II. Analysis
## A. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to support his convictions. He essentially attacks the credibility of the witnesses against him. The State responds that the jury accredited the testimony of the State's witnesses and the evidence supports the jury's verdict. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999)( (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "'A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State.'" *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" which may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In this case, the Defendant was convicted of first degree premeditated murder. This requires proof beyond a reasonable doubt that the Defendant killed the victim intentionally and with premeditation. *See* T.C.A. § 39-13-202 (1991). The Defendant was also convicted of aggravated robbery. Aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" where the defendant uses a deadly weapon or causes seriously bodily injury to the victim. T.C.A. §§ 39-13-401(a), -402(a) (1991).

After reviewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support the Defendant's convictions. The evidence established that the Defendant met and arranged with Rigling to stage a robbery of Rigling's market and kill Rigling's wife, the victim. The Defendant recruited Hogan to participate in the plan, and the two men shared in the proceeds. The Defendant met Hogan on the day of the murder and robbery after checking in at work, and the two drove in Hogan's 1978 black Olds Cutlass Supreme to the market. When the men entered the market, the Defendant ordered the victim, who was seated behind the counter, to open the cash register. When she refused, the Defendant shot her once in the head, killing her, and she fell forward onto the counter. The Defendant ordered Hogan to open the cash register while the Defendant pushed the victim backward off the counter top onto the ground behind the counter. When Hogan could not open the cash register, the Defendant cut the wires and Hogan took the entire cash register and left the market. The Defendant was paid in two installments for his completion of the robbery and murder of the victim. This evidence is sufficient to support the Defendant's convictions for first degree premeditated murder and aggravated robbery.

16

As to the Defendant's contention that State witnesses, specifically Hogan and Higgins, were not credible, we would note that issues of identity and credibility are classic jury questions. *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006). Further, as stated above, questions concerning the credibility of the witnesses are resolved by the trier of fact. *Bland,* 958 S.W.2d at 659. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. Hogan and Higgins were both thoroughly challenged by the Defendant's attorney during cross-examination. The jury was well-informed that the witnesses had motive to lie and/or had lied previously. The jury also had ample evidence upon which it could conclude that the Defendant committed first degree premeditated murder and aggravated robbery. Thus, we will not disturb the jury's verdict.

Accordingly, we conclude that the State presented sufficient evidence for a rational jury to find the Defendant guilty beyond a reasonable doubt as to both first degree premeditated murder and aggravated robbery. The Defendant is not entitled to relief.

## B. Recanted Testimony

The Defendant asserts that the trial court erred in not granting a new trial due to Higgins recanting his trial testimony. The State asserts that, because the trial court found Higgins' testimony at the hearing on the motion for new trial not credible, the trial court did not err in denying the Defendant a new trial. We agree with the State.

The test for granting a new trial in cases involving recanted testimony as newly discovered evidence is based on the following criteria:

> A new trial may be granted because of recanted testimony when (1) the trial judge is reasonably well-satisfied that the testimony given by a material witness was false and that the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, was surprised by false testimony, or was unable to know of the falsity until after the trial; and (3) the jury might have reached a different conclusion had the truth been told. *State v. Mixon*, 983 S.W.2d 661, 666 (Tenn.1999)).

*State v. Housler*, 193 S.W.3d 476, 494 (Tenn. 2006). The decision as to whether to grant a motion for new trial on the basis of newly discovered evidence lies within the sound discretion of the trial court. *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App.1997) (citing *Hawkins v. State,* 220 Tenn. 383, 417 S.W.2d 774, 778 (Tenn. 1967)).

17

At the Defendant's trial, Higgins gave a detailed account of the crimes consistent with other evidence in the case. Higgins said that the Defendant told him the details of the crimes while the two were incarcerated in the local jail. At the hearing on the motion for new trial, Higgins recanted his trial testimony, saying that the Defendant's only statements to him about the crimes were that the Defendant was not involved. Higgins explained that he lied at trial because he felt pressured by his attorney, Agent Melton, and the State to provide the false testimony. He said that his attorney, Pierchoski, and Agent Melton provided him with the details of the crimes and "led" his testimony. In contrast, both Agent Melton and Pierchoski testified that Higgins provided all of the details during the initial interview. At the end of the hearing, the trial court denied the Defendant's motion for new trial and specifically found "Steven Higgins 100 percent not credible."

Before a trial court can grant a new trial, it must find that the testimony given by the material witness was false at trial and the new testimony is true. After hearing Higgins's testimony and observing his demeanor at the hearing on the motion for a new trial, the trial court did not find Higgins credible. Instead, the trial court found credible Agent Melton's and Pierchoski's testimony that Higgins provided a lengthy, detailed account of the Defendant's statements about the crimes, which was consistent with his trial testimony, and that neither Agent Melton nor Pierchoski provided Higgins with information or details about the case. Therefore, the trial court did not err in denying the Defendant a new trial on the basis of Higgins's recantation. The Defendant is not entitled to relief.

### C. Material Witness Attachment

The Defendant argues that the trial court improperly issued a material witness attachment for Penny and Mark Boyd, State witnesses, requiring bond before release. The State responds that the Defendant has waived this issue by failing to raise it in his motion for new trial.

Tennessee Rule of Appellate Procedure 3(e) requires that all issues raised on appeal must be "specifically stated" in a motion for a new trial, or the issue "will be treated as waived." The grounds relied upon must be specified with reasonable certainty in a motion for a new trial to advise the trial court and opposing counsel of the alleged error relied upon and also to enable this Court to see that the alleged error was presented to the trial court for correction. *State v. King*, 622 S.W.2d 77, 79 (Tenn. Crim. App. 1981).

After a review of the record, we conclude the Defendant failed to raise this issue in his motion for new trial. Consequently, he has waived review of this issue pursuant to Tennessee Rule of Appellate Procedure 3(e).

## D. Consecutive Sentencing

The Defendant challenges the trial court's imposition of consecutive sentencing in this case, based upon a finding that the Defendant has an extensive criminal history and is a dangerous offender. The State responds that the trial court did not err in imposing consecutive sentences because the record supports the imposition of consecutive sentencing, and the trial court made the requisite *Wilkerson* findings. We agree with the State.

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115(b)(1) - (7) (2010). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102(1), -103(2) (2010); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

In this case, the trial court found the following consecutive sentencing criteria applicable:

> (2)   The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4)   The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

T.C.A. § 40-35-115 (2) and (4) (2010).

## 1. Extensive Criminal Activity

The Defendant asserts that his criminal record is not "extensive." The State responds that the trial court made appropriate findings in ordering the Defendant's aggravated robbery sentence be served consecutively.

The trial court made a finding that the Defendant's criminal activity was extensive. In reviewing the Defendant's criminal history, the trial court found six felony convictions and twenty-seven misdemeanor convictions. The Defendant's convictions included such offenses

as reckless aggravated assault, drug possession, and damage to property. The trial court noted that the Defendant's first conviction was in 1984 and his most recent, at the time of the sentencing hearing, was in 2007.

We conclude that the evidence does not preponderate against the trial court's finding that the Defendant's record of criminal activity is extensive. *See State v. Chrisman*, 885 S.W.2d 834, 839 (Tenn. Crim. App. 1994) (holding that proof of two prior drug convictions, two weapons offense convictions and numerous misdemeanor driving offenses, was sufficient for a finding that the defendant had an extensive criminal record.). Thus, the trial court did not abuse its discretion by ordering the Defendant's twelve-year sentence to run consecutively to his sentence of life imprisonment.

## 2. Dangerous Offender

The Defendant asserts that the trial court erred in its application of criteria (4), that the Defendant is a "dangerous offender." The State responds that the trial court made appropriate findings supported by the record.

In considering whether the dangerous offender criteria was applicable, the trial court stated, "He shot this woman in cold blood, right between the eyes . . . resulting in her death, once she refused to hand over the money." The trial court went on to consider whether confinement was necessary to protect the public and found that it applied based upon the Defendant's "prior record and the aggravating circumstances of this murder and robbery." Finally, the trial court found that the aggregate length of the sentence reasonably related to the offenses committed.

A trial court's finding that the Defendant is a "dangerous offender" by itself is insufficient to support consecutive sentences. In *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), our Supreme Court set forth additional requirements for consecutive sentences when the defendant is a "dangerous offender." Accordingly, in order to base consecutive sentencing on the dangerous offender category, the trial court must find: (1) that the term imposed "necessary in order to protect the public from further criminal acts by the offender;" and (2) "that the terms imposed are reasonably related to the severity of the offenses committed." *Id*. at 938. The requirement of additional findings when the defendant is a "dangerous offender" "arises from the fact that of all of the categories for consecutive sentencing, the dangerous offender category is the most subjective and hardest to apply." *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999). The other categories for consecutive sentencing have "self-contained limits;" thus, the additional findings are limited to cases involving consecutive sentencing of "dangerous offenders." *Id*.

20

We conclude that the evidence supports the trial court's imposition of consecutive sentences based upon a finding that the Defendant is a "dangerous offender." The evidence proved that the Defendant agreed to stage a robbery and kill the victim for payment. On the day of the robbery and murder, the Defendant checked in at work and then left to meet Hogan. The two men drove to the market, entered, and the Defendant demanded the victim open the cash register. When she refused, the Defendant shot her in the head once, killing the victim. This evidence supports the trial court's finding that consecutive sentencing is necessary to protect the public and that the sentence is reasonably related to the seriousness of the offenses committed. The Defendant is not entitled to relief on this issue.

### E. Juror's Prior Knowledge

The Defendant argues that the trial court erred in denying the Defendant a new trial based upon the prior knowledge of the case by juror William Sherrill. The Defendant asserts that Sherrill knew the Defendant before the trial and had a prior opinion about the Defendant but "concealed" these facts from defense counsel during voir dire. Because of Sherrill's failure to disclose his acquaintance with the Defendant, the Defendant states that he was prejudiced at trial. The State responds that the Defendant failed to prove his claim and, therefore, the trial court correctly denied the Defendant a new trial. We agree with the State.

Article I, section 9 of the Tennessee Constitution guarantees a criminal defendant the right to trial "by an impartial jury." In fact, every accused is guaranteed "'a trial by a jury free of . . . disqualification on account of some bias or partiality toward one side or the other of the litigation.'" *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting *Toombs v. State*, 197 Tenn. 229, 270 S.W.2d 649, 650 (1954)). In Tennessee, challenges to juror qualifications generally fall into two categories-propter defectum, "on account of defect," or propter affectum, for or on account of some affection or prejudice. *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003); *Akins*, 867 S.W.2d at 355. "Where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the defendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993) (citing *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980)). The defendant bears the burden of proving a prima facie case of bias or partiality. *Id.* (citing Taylor, 669 S.W.2d at 700).

We conclude that the Defendant did not prove a prima facie case that the juror, Sherrill, was biased. While Sherrill testified that he believed his son's mother may have married "a Stagg," he also testified that he did not know the Defendant. Sherrill maintained during both voir dire and the motion for new trial that he did not know the Defendant. He testified that he never made the statement that he wished to see the Defendant "fry," or that he believed the Defendant to be Mann's father as testified by Mann and Staggs. The trial

21

court found Sherrill's testimony to be credible and specifically stated that it did not find Mann's or Staggs' testimony credible. Under these circumstances, we conclude that the trial court properly denied the motion for a new trial, and the Defendant is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE